MARKS et al. v. MERRILL PAPER MFG. CO. et al.

(Circuit Court, W. D. Wisconsin. July 28, 1911.)

1. CORPORATIONS (§ 180*)—STOCKHOLDERS—DIRECTORS—NATURE OF OBLIGATION.

Since majority stockholders and directors of a corporation occupy a fiduciary relation to the minority, no action taken by the majority or by the directors, prejudicial to the rights of the minority, and by which the majority gain an advantage over the minority, will be sustained in equity.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 180.*]

2. CORPORATIONS (§ 573*)—SALE OF ASSETS—VALIDITY.

Where a corporation was insolvent and doing a losing business, and its stockholders were unwilling to furnish additional capital pursuant to an equitable plan, and certain of its stockholders thereupon formed a new corporation and purchased the old company's equity in mortgaged water power, the subsequent sale of all the old company's assets to the new for an amount sufficient to pay all of its creditors pursuant to a plan authorizing all of the stockholders of the old company to become stockholders in the new company on the same basis, was neither inequitable nor invalid as an impairment of the rights of minority stockholders who did not see fit to take up their rights in the new company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2293–2296; Dec. Dig. § 573.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Bill by Fred J. Marks and others against the Merrill Paper Manufacturing Company and others. Decree for defendants.

Bulkley, Gray & More, for complainants.

Smart, Van Doren & Curtis, for defendants.

SANBORN, District Judge. Final hearing on bill to set aside a conveyance of the property of the Merrill Company to the Grandfather Falls Company. Complainants are minor stockholders of the Merrill Company. Marks holds 50 shares, Klapperich 100 shares, and Mrs. Scott 50 shares of the capital, the total amounting to $200,-000. The individual defendants are all the stockholders of the Merrill Company. The alleged equity of the bill is that the individual defendants are majority stockholders of the two companies, and were such at the time of the transfer; that the majority stockholders have obtained unauthorized advantage from such transfer, not shared in by the minority; and, therefore, that the transfer is fraudulent and void, and should be set aside, and if it cannot now be avoided on account of the rights of the innocent third persons, such other relief as may be proper should be given.

The proof shows that the Merrill Company was organized January 19, 1905, with a capital of $160,000, afterwards increased to $200,000. The corporation was organized for the purpose of making print paper. After the company commenced business it was found that it had insufficient water power. At that time it had a total investment in money in its plant and transmission line of about $444,000. In order to obtain sufficient water power it purchased certain interests in lands on the Wisconsin river at Grandfather Falls, agreeing to pay therefor $62,500. This was in April, 1905. The amount paid down was $2,500, the balance being payable in yearly installments, running five years at 6 per cent. interest. In order to raise the money to develop the Grandfather Falls power, and pay certain debts of the Merrill Company, the attempt was made to increase the stock to $400,000. Several attempts were made to raise money for the sale of stock, and a plan was adopted by which stock was to be sold on condition that 95 per cent. of the stockholders would subscribe for the new stock, up to three-fourths of the present stock. The persons holding the stock now owned by the minority were solicited to come in on this basis, but refused to do so. The holders of the majority of the stock were willing to take the increased amount but were unwilling to do so unless a large proportion of the stockholders would come in on the same basis. Repeated attempts were made to induce the minority of the stockholders to take the new stock; all of which failed. The Merrill Company was obliged to buy pulp in order to make the paper which it had contracted to sell and was constantly losing money and going deeper into debt. Being unable to raise any more money through the sale of its stock, it could not develop the Grandfather Falls power. In this situation a number of its largest stockholders organized the Grandfather Falls Company, June 1, 1906, for the purpose of building a dam at Grandfather Falls and with power to build and maintain dams, construct and maintain hy-

draulic and electrical plants, sawmills, and paper mills, and carry on a general pulp and paper business. The capital was $200,000, afterwards increased to $400,000. Upon its organization the Grandfather Falls Company made a proposition to the Merrill Company to purchase its rights and interests in the lands at Grandfather Falls, and June 14, 1906, the stockholders of the Merrill Company held a meeting and passed a resolution to convey to the Grandfather Falls Company all their interests in the lands at Grandfather Falls in consideration of the repayment of the $2,500 paid by the Merrill Company for such rights and the assumption of the debts thereon. It was also resolved that they should enter into a contract to procure from the Grandfather Falls Company 2,000 or more horse power for three years, commencing as soon as the power plant should be ready, at a rental of not over $25 per horse power per year, payable in equal monthly installments at the end of each month. The dam at Grandfather Falls was not then commenced, and it was not expected it would be in operation for a year or more.

In the latter part of the year 1906 the affairs of the Merrill Company were in a very critical condition. There were pressing claims amounting to $68,393.59 and past-due bonds for $33,000. It was unable to raise any money to pay these liabilities either by loans from its stockholders or others, or by the sale of stock. In this situation a proposition was made by the Grandfather Falls Company to the Merrill Company to purchase all its property for the amount of its indebtedness. At this time the stockholders and officers of both companies were substantially the same. The Merrill Company being without adequate water power its property was of very small value in proportion to what it had cost. Its value was some $25,000 less than the amount of its debts. It was not in any position to procure power for some time to come. A plant without water power is worth only what it will bring to wreck, dispose of its machinery and other property to its best advantage. Under these circumstances it was competent for the stockholders and officers of the Grandfather Falls Company to purchase from themselves as stockholders and officers of the Merrill Company all the property of the latter, if this could be done at a fair sale without fraud or undue advantage. The proposition of the Grandfather Falls Company was accepted by resolution of the Merrill Company dated December 15, 1906, and the arrangement was carried out by the execution and delivery of a deed of conveyance to the Grandfather Falls Company by the Merrill Company, January 15, 1907, for an expressed consideration of $186,000.

The plan of the majority stockholders of the Merrill Company is expressed in a subscription paper which formed the basis of the organization of the Grandfather Falls Company, as follows:

"We, the undersigned, do each for himself, alone, separately and severally, subscribe for and agree to purchase and pay for in cash, at par value, the number of shares of the capital stock of the Merrill Paper Manufacturing Company set opposite our respective names here following: On condition, however, that the owners of not less than 95 per cent. of the present outstanding capital stock of said company each in like manner subscribe for additional stock of said company, equal in each instance to not less than 75 per. cent. of his present holdings. And in case said condition shall not be complied

with within 15 days, then we agree to incorporate and organize a corporation under the laws of Wisconsin, to be known as the Grandfather Falls Company, for the purpose of purchasing the lands and water power facilities at Grandfather Falls heretofore owned in common by Messrs. Anson S. Heinemann, B. Heinemann, Harmon, O'Day and Daly Estate, and providing boomage facilities, improving navigation, developing water power thereon, and purchasing and holding the stock of the undersigned in Merrill Paper Manufacturing Company and other stock in manufacturing corporations likely to need or use said power, and for such other purposes as may be agreed upon. And upon such incorporation being effected this subscription shall as to each subscriber stand as a subscription and agreement to purchase at par value the same amounts respectively of the capital stock of said Grandfather Falls Company, and we each severally agree to pay our respective subscriptions on demand of the proper board of directors."

At a directors' meeting of the Grandfather Falls Company February 18, 1907, resolutions were passed for the issuing of a stock dividend in the Grandfather Falls Company of 133⅓ per cent. of the holdings of the stockholders in that company. This stock dividend was based upon the shares in the Merrill Company held by shareholders in the Grandfather Falls Company. Two resolutions were passed at the same time as follows:

"The following resolution was then presented and carried unanimously: Resolved that the company's holdings of stock in the Prairie River Improvement & Boom Company, representing property that cost in round figures $64,-000 and carried on our books at that amount; and that the company's property carried on the books under the head of 'Plant' which originally cost to construct the sum of $——— in round numbers to be valued at $258,000 and be carried on the company's books at that amount. The following resolution was then presented and carried unanimously: It appearing that after making the valuation aforesaid that a statement of the company's assets and liabilities shows a surplus of over $163,000; therefore be it resolved that a stock dividend of 133⅓ per cent. be declared and the stock therefor ordered issued, subject to the approval of the stockholders at their next meeting."

It will readily be seen that this stock dividend would not add anything to the real interest of the persons receiving it, for the reason that it was substantially proportional. The reason for making the dividend was to aid small stockholders to borrow money on their stock in the Grandfather Falls Company. Some of these stockholders had pledged their stock in the Merrill Company, but that had become worthless by the sale of the assets of that company. If these shareholders could pledge their original stock in the Grandfather Falls Company and add thereto the amount received by them on the stock dividend, their holdings would thus appear to be substantially doubled and they might then perhaps borrow enough more money to pay for their original stock in the Grandfather Falls Company. That it really added nothing to the actual voting power and value in stock interest in the Grandfather Falls Company seems to be entirely clear. At the beginning of the taking of the testimony in this case the following offer was made on behalf of the defendant:

"Mr. Smart: In behalf of the defendant in this case, and particularly the Grandfather Falls Company, we desire to make this statement: That it has been the position of the defendants and the defendant companies to all times that there has been no intent or desire or conspiracy to freeze the complainants in this action, or any stockholders of the Merrill Paper Company, out of the old company or to injure it in any way, and that they have been solic-

ited and every effort has been made to get them to join in saving the property of the Merrill Paper Company. In further evidence of that intent and purpose, we desire to state at this time that the defendants will cause and procure, and do hereby offer to the complainants the opportunity to obtain stock and to become interested in the Grandfather Falls Company on exactly the same basis and terms under which the other stockholders became interested, with this condition, that there should be added to the amount that they would have to pay to get in at the time of the organization of the company, or the reorganization or the purchase of the Merrill Paper Company property a sum equal to the interest on such original amount up to the time of the acceptance of this offer. Mr. More: You make no offer, as I understand it, to issue to them stock in the Grandfather Falls Company equivalent to their stock in the Merrill Company, do you except on condition? Mr. Reid: There is no condition whatsoever. Our statement here is not based upon any such hypothesis. There is no condition attached to this whatsoever. The complainants may become stockholders and members of the Grandfather Falls Company on exactly the same basis that every present stockholder became a stockholder, with interest upon the money when they would otherwise have paid their money in. I did not understand what you referred to when you said something about issuing stock of the Merrill Manufacturing Company. What do you mean? Mr. More: You would issue them stock in the Grandfather Falls Company for the amount of stock which they hold in the Merrill Paper Company, share for share. Mr. Reid: Independently of anything else? Mr. More: Yes. Mr. Reid: No, sir. There isn't anybody that ever got anything on that basis."

Judge Reid represented the defendant in connection with Mr. Smart, and Mr. More is one of the solicitors for the complainant.

After the conveyance to the Grandfather Falls Company, of which complainants had knowledge at or about the time it was made, the company issued and sold its bonds to creditors having no knowledge of the rights of the minority. Complainants delayed bringing this suit until December, 1907, nearly a year after the conveyance. Under these circumstances the sale cannot be set aside; but if the majority thereby obtained any benefit or property interest not shared by the minority or afterwards used their power to obtain any such benefit in any other way adequate relief may be decreed. It is insisted that the sale was not a real transaction. It is said that the business of the Merrill Company went right on after the sale, just as before, and that the sole purpose of the transaction was to deprive the minority of their property rights in the Merrill Company if they declined to join the majority in the purchase of further stock. It is true that the sale would not have been made if the minority had been willing to come in. They were given the alternative to do so, or lose their rights through a sale of the property. Choosing the latter alternative, the question is whether there was any fraud on them, whether the majority have used their position to oppress or injure them in any way, or have gained any undue or inequitable advantage over them. The authorities on this question leave the law in no doubt whatever. [1] The rule is stated by Sanborn, Circuit Judge, in Jones v. Missouri Edison-Electric Co., 144 Fed. 765, 75 C. C. A. 631, where the transaction was condemned, and proper relief directed, as follows:

"The fraud or breach of trust of one who occupies a fiduciary relation while in the exercise of a lawful power is as fatal in equity to the resultant act or contract as the absence of the power. The relation of a stockholder

to his corporation, to its officers and to his costockholders is a relation of trust and confidence. The corporation holds its property in trust for its stockholders who have a joint interest in it. The officers of the corporation, if not technical trustees for the stockholders, are such in so real a sense that any use by them of the property of the corporation for their own profit to the detriment of any of the stockholders is a breach of their trust and their duty, which is actionable in equity. The stockholders of a corporation are jointly interested in the same property and in the same title. Community of interest in a common property or title imposes a community of duty and mutual obligation to do nothing to impair the property or the title. It creates such a fiduciary relation as makes it inequitable for any of those who thus share in the common property to do anything to or with it for their own profit at the expense of others who have the same rights."

The leading case to the same effect in the Supreme Court, where a consolidation was upheld, is Leavenworth County v. Chicago, R. I. & P. R. Co., 134 U. S. 688, 10 Sup. Ct. 708, 33 L. Ed. 1064. Other cases in point are McCourt v. Singer-Bigger, 145 Fed. 103, 76 C. C. A. 73; Burnes v. Burnes, 137 Fed. 781, 70 C. C. A. 357; Wheeler v. Abilene National Bank Building Co., 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892; Figge v. Bergenthal, 130 Wis. 594, 109 N. W. 581, 110 N. W. 798; Rogers v. Nashville Co., 91 Fed. 299, 33 C. C. A. 517; Werle v. Northwestern Co., 125 Wis. 534, 104 N. W. 743. These decisions, and many others, agree substantially with the rule laid down by Judge Sanborn in the language quoted.

[2] Applying such rule to this case I find that the sale in question was a fair one, that the majority have not obtained any advantage whatever over the minority, and that the bill should be dismissed. The legal relations of the majority and minority are well expressed by the Supreme Court of Illinois, in Harts v. Brown, 77 Ill. 226, as follows:

"The stockholders had been called together and they were urged to make advances in proportion to the stock they severally held and thus relieve the company and preserve its existence, but this they refused to do, and as it could not be preserved and must come to an end by a sale under the power in the trust deed, no reason is perceived why appellants might not become purchasers at the sale. They were under no moral or legal obligation to advance their own means, pay the debt and preserve the property for the use of the other stockholders who had declined to join in making pro rata advances to relieve it from debt. Appellants seem to have acted fairly, *as they purchased at a sum sufficient to pay all the debts of the company.* They chose to do so rather than make an effort to obtain all the property for the debts secured by the trust deed and the certificate of purchase. On the contrary they gave many thousand dollars more that honest creditors might be fairly paid and the company wrong no one. This does not have the appearance of fraud. Appellants had faith that the enterprise could be carried out with success, and that they could thus save the means they had advanced, but appellees, by the course they adopted, manifested an entire want of confidence in its ultimate success. They were even offered the opportunity to come in for a considerable period afterwards and share in the new enterprise by advancing a ratable portion of the means, but they all declined; but when success was achieved they then saw advantages they had lost, and then sought to set aside the sale and have the property restored to the old company, and thus reap the benefits arising from the enterprise and means advanced by others. To do so should show fraud, or want of power to make the sale or the purchase by appellants, neither of which has been done."

Decree for defendants, with costs.